IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL ALVAREZ,

        Plaintiff,

vs.                                     No. CIV 03-004 LFG

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Alvarez ("Alvarez") invokes this Court's jurisdiction under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Alvarez was not eligible for Supplemental Security Income ("SSI"). Alvarez moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing [Doc. 9]. Both parties consented to exercise of jurisdiction by a Magistrate Judge [Doc. 2,3].

## Background

Alvarez was born on January 14, 1959 and was 42 years and 11 months old at the time of the administrative hearing in this case. He has an eighth grade education.[1] His prior work experience consists of periods working as a laborer, roofer, dishwasher, hotel/motel housekeeper, and

---

[1]At three places in the record, Alvarez is described as having 11 years of formal education and/or a G.E.D. (Tr. 217, 283, 295). However, the record otherwise consistently gives his educational level as eighth grade, he so testified and the administrative hearing, and the ALJ so found. (Tr. 24). The Court therefore assumes an eighth grade education.

maintenance man.  Alvarez alleges disability due to a seizure disorder, liver disease, ulcers, chronic neck and back pain, and emotional problems including depression and anxiety.

Alvarez applied for SSI benefits with a protective filing date of July 20, 1999, alleging an onset date of January 1, 1992.  The application was denied initially and on reconsideration, and Alvarez requested a hearing before an Administrative Law Judge ("ALJ").  The hearing was held on December 20, 2001.  The ALJ issued his opinion on March 22, 2002, finding that Alvarez was not disabled in that, were it not for alcohol abuse, he would be able to perform his past relevant work as a motel housekeeper as well as other relevant work available in the national economy.

Alvarez requested a review of the ALJ's opinion, submitting additional medical reports to the Appeals Council which had not been considered by the ALJ.  The Appeals Council considered this additional evidence but nevertheless upheld the ALJ's findings on October 28, 2002.  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are:  at step one, claimant must prove he is not currently engaged in

---

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2003); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2003); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the Listings, that is, the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2003);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]    If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove at step five that, considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, he is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

In cases where the claimant is found to be disabled, but there is medical evidence of alcoholism or drug addiction on the record, the ALJ must also make a determination whether the

---

[4]20 C.F.R. §§ 404.1520(b), 416.920(b)(2003).

[5]20 C.F.R. §§ 404.1520(c), 416.920(c)(2003).

[6]20 C.F.R. §§ 404.1520(d), 416.920(d) (2003).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [him] from doing any gainful activity."  20 C.F.R. §§ 404.1525(a), 416.925(a) (2000).

[7]20 C.F.R. §§ 404.1520(e), 416.920(e) (2003).

[8]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2003).

[9]20 C.F.R. §§ 404.1520(f), 416.920(f) (2003).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

addiction is a contributing factor material to the determination of disability, that is, whether the claimant would be disabled apart from substance abuse.  42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 28 C.F.R. § 416.935(a).  As the ALJ noted, "Public Law 104-121, enacted on March 29, 1996, included provisions applicable to disability benefit payments and made significant changes in the entitlement to benefits under Title XVI of the Social Security Act in situations where Drug Addiction and/or Alcoholism are contributing factors material to the determination of disability."  (Tr. 17).

> Under the regulations, the key factor the Commissioner must examine in determining whether drugs or alcohol are a contributing factor to the claim is whether the Commissioner would still find the claimant disabled if he or she stopped using drugs or alcohol.  20 C.F.R. § 416.936 (b)(1).  Under this regulation, the ALJ must evaluate which of plaintiff's current physical and mental limitations would remain if plaintiff stopped using alcohol, and then determine whether any or all of plaintiff's remaining limitations would be disabling.

Drapeau v. Massanari, 255 F.3d 1211, 1214 (10th Cir. 2001).  The ALJ must first make a determination that the claimant is disabled and, if so, the ALJ must then determine whether the claimant would still be found disabled if he stopped abusing alcohol.  Id.

In the case at bar, the ALJ made the dispositive determination of non-disability at step four of the sequential evaluation, finding that if not for alcohol abuse, Alvarez would be capable of performing his past relevant work as a motel housekeeper.  The ALJ also went on to step five and found that, absent alcohol abuse, Alvarez could perform work existing in substantial numbers in the national economy.  (Tr. 25).  Alvarez contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry the applicable burden of proof, and that the Commissioner did not apply the correct legal standards.

## Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th cir. 1991).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.  (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Alvarez claims on this appeal that the additional evidence submitted to the Appeals Council after the ALJ made his decision, as well as an additional item of evidence submitted to the Court with Plaintiff's Reply Brief in this appeal, is significant and would have changed the ALJ's decision had

it been before him.[11]  Alvarez's position is that the new evidence establishes that both his seizure disorder and his depression qualify under the Listings, and both were caused by a traumatic brain injury he suffered in 1994 and are not due to alcoholism.

The Commissioner argues that the relevant time frame for Alvarez's claim is the period between July 20, 1999, the application date, through March 22, 2002, the date of the ALJ's decision, and that the new evidence consists of reports of medical care providers who examined Alvarez after the relevant time period.  In addition, the Commissioner argues, the new evidence is outweighed by other medical evidence on the record which supports the ALJ's findings.

The Court notes, first, that the new evidence submitted at the time of Alvarez's request for review by the Appeals Council  is material and was properly considered by that body, and is properly part of the record.  The new evidence "relates to" the period before the date of the ALJ's decision, 28 C.F.R. § 416.1470(b), as it deals with a traumatic brain injury alleged to have occurred in 1994, which is within the relevant period.  The medical examination itself does not have to have occurred within that period.  The Court therefore considers the post-hearing evidence, along with all the other evidence on the record, in determining whether the Commissioner's decision was supported by substantial evidence.   The record evidence is as follows.

**Factual Background**

Alvarez contends that his seizure disorder was exacerbated, and his emotional problems began, when he sustained a traumatic injury to the brain in 1994 in an assault which nearly killed him

---

[11]The new material consists of Alvarez's treating psychiatrist's report dated September 6, 2002, and a report by Alvarez's treating counselor dated August 27, 2002.  In addition, Plaintiff submits to the Court, as an exhibit attached to Plaintiff's Reply Brief (Ex. A to Doc. 12), a letter from the treating counselor dated August 18, 2003.

and resulted in a month-long hospitalization.   He contends that it is this injury, and not his acknowledged long-term alcohol abuse, which is the cause of his current disability.   He says that it was only recently, indeed, after the ALJ's decision, that his physicians recognized the brain trauma as the cause of his difficulties.   Alvarez has not submitted any medical records from 1994 in support of this claim, but the medical and counseling records which he has submitted indicate the following course of physical and mental problems, and treatment therefor:

In 1996, Alvarez was being treated by a private physician, Dr. Cornelius P. Dooley, a specialist in gastroenterology.   Alvarez was first seen by Dr. Dooley in April 1996, at which time Alvarez told the doctor that he had cirrhosis of the liver, apparently due to alcoholism.   He told Dr. Dooley he was making an effort to discontinue the use of alcohol and wanted help getting into a rehabilitation program.   (Tr. 250).   In June of that year, Dr. Dooley performed an endoscopy, based on Alvarez's history of gastrointestinal bleeding.   He found scattered erosions in the duodenum and stomach, and a small hiatal hernia.   He took biopsies from the stomach, which showed active chronic gastritis.   (Tr. 248-249).

Over the years, Dr. Dooley has written several "To Whom It May Concern" letters on behalf of Alvarez, apparently in support of Alvarez's quest for disability benefits.   He says in these letters, dated 1996, 1997, 1998, 2000 and 2001, that he has been treating Alvarez for abdominal pain, peptic ulcers, gastritis, acid reflux, and liver disease based on past alcohol use.   He also mentions "quite significant psychiatric problems" but does not specify what these are.   He states that Alvarez is unable to work and recommends that Alvarez be given Medicaid and disability benefits.   He also recommends at one point that Alvarez be admitted into a rehabilitation program for alcoholics.   (Tr. 241, 243, 246, 247, 255, 257, 290).

Alvarez has been a patient at the Santa Fe Community Guidance Center (SFCGC) for many years. The records of his treatment there show that he was first seen in December 1998, seeking a medical evaluation and help with his SSI application. He reported a history of multiple deaths in his family, and said he himself had a near-death experience. There is no elaboration of this statement; it could refer to the 1994 beating, but the record is not clear on this point. Alvarez also complained of cirrhosis, bleeding ulcers and constant pain. (Tr. 208-209). A note dated December 4, 1998 signed by a licensed social worker gives a diagnosis of post-traumatic stress disorder ("PTSD"), depression, and alcoholism "in remission now 1 year." (Tr. 208).

Another note, labeled Intake Assessment, is undated but appears to have been written in 1998, as Alvarez's age is given as 39 years old. The note, signed by a licensed social worker, stated that Alvarez's complaints included anxiety, sleeplessness and depression related to multiple deaths in his family and a near-death experience three years earlier. (Tr. 150). The note also stated that Alvarez suffered from seizures, possibly from alcohol use, but that he was in full recovery from alcohol dependence. The diagnosis was PTSD with anxiety and depression, liver problems, back pain, ulcers, and alcohol dependence in sustained full remission. There is also a note of a possible diagnosis of alcohol induced persisting dementia. (Id.).

Alvarez was referred to a stress management group at SFCGC. From the beginning, he stated that he had transportation problems and wasn't sure he could arrange to be there regularly. He attended sporadically from December 1998 to August 1999, often not showing up for scheduled group meetings or canceling for lack of transportation. (Tr. 164-173, 175-180, 182-200).

During this period, the records indicate that Alvarez continued to drink alcohol. On January 5, 1999, he was examined by a physician at SFCGC, who noted that he had PTSD and possible

cirrhosis.  The medical notes stated that Alvarez smelled of alcohol and had shaky, forced speech and was quite anxious.  He denied drinking, and even told the doctor he had not had a drink in two years.  However, his blood alcohol level that day measured 0.174, over twice the level for legal intoxication.  (Tr. 203).  He returned to SFCGC the next day, again smelling of alcohol.  His next visit was 6 days later, when he again smelled of alcohol.  The doctor noted the Alvarez was not willing to go into rehab and was "completely unwilling to accept [the] situation," apparently referring to his alcohol abuse and need for treatment.  (Tr. 158).

A Psychiatric Evaluation was done by SFCGC Staff Psychiatrist Dr. Robert Capper on January 5, 1999.  Dr. Capper noted that Alvarez told him he'd been having grand mal epileptic seizures for the past eight years, and that he was experiencing seizures about twice a week.  During these seizures, he said, he soils his pants "with urine and BM," which is very embarrassing.  Alvarez told Dr. Capper that he could not work, because no one will hire him due to the seizures.  He said he could no longer afford medication, but when he took it in the past, it seemed to help and he didn't have seizures.  He said he had cirrhosis of the liver and had not had alcohol in two years.  (Tr. 213).

Dr. Capper noted that Alvarez seemed "a little bit on the depressed side but nothing of any significance."  (Tr. 214).  His affect was noted as "quite good," although he spoke of depression.  The doctor also noted "an absence of any psychotic material," and Alvarez's "ability to reach goal ideas is quite good."  He felt that Alvarez's primary motivation in coming to see him was to get help getting back on SSI, so that he can afford medication for his seizures and thereafter get a job and be able to take care of himself.  Dr. Capper recommended that Alvarez be referred to a primary care physician for seizure medication, then return to see him after a period of time on the seizure medication, if his depression didn't lift.  (Tr. 214).

Dr. Capper's diagnosis was depression with anxiety, reactive type related to lack of funds for medications.  He also noted cirrhosis, ulcers, and back pain from repeated back injuries caused by falls during seizures.  He also noted a "childhood propensity for substance abuse, especially alcohol."  He gave Alvarez a GAF score of 55 to 60.[12]   (Tr. 214-215).

On January 27, 1999, Alvarez's counselor called him because he hadn't shown up for group sessions.  The counselor asked him if he wanted treatment for his alcoholism, and he responded that he would take care of it himself.  The counselor noted that he was in denial and had not participated seriously in therapy. (Tr. 197).  Alvarez missed numerous appointments in February, March and April of that year, and when he did return to see the counselor, on April 21, 1999, he smelled of alcohol, which he told the counselor was cough syrup.  (Tr. 182).

On June 8, 1999, Alvarez called his counselor to say he was in jail.  He said he'd been in an automobile accident, and that he'd had "a little bit" to drink and had a seizure.  He was feeling depressed.  The counselor noted "He needs inpatient treatment for his drinking. He's in denial."  He planned to discuss inpatient treatment with Alvarez once he was released from jail.  (Tr. 173).   In July 1999, after Alvarez missed several more appointments, this counselor decided to drop Alvarez from the group sessions and to refer him to a different counselor at SFCGC, apparently for individual therapy.  (Tr. 164, 166-168).

---

[12]"GAF" stands for the Global Assessment of Functioning scale, which is a measure of functional status and severity of psychiatric disturbance rated on a continuum of 0-100 from most to least impaired.  Winick, Bruce J., et al., Endorsement of Personal Benefit of Outpatient Commitment Among Persons With Severe Mental Illness, 9 Psychol. Pub. Pol'y & L. 70, 77 (March/June 2003).  Plaintiff supplied an excerpt from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th ed.(DSM-IV), which sets forth the meaning of GAF scores and provides that a GAF of 55 to 60 indicates moderate symptoms (such as flat affect and circumstantial speech, or occasional panic attacks) or moderate difficulty in social or occupational functioning.  [Doc. 9, Ex. 2].

Alvarez also saw an M.D. at the center in late April 1999.  He told the doctor he had been having seizures once a week and that he drank one beer a day to control "the shakes."  The doctor noted that Alvarez had multiple complaints and "feels he needs meds but is so very non-specific and evasive."  The doctor prescribed Trazodone, an antidepressant.  (Tr. 181).  He returned to see this same doctor on June 3, 1999.  At this time, he looked better, had been sleeping better, and had been having fewer seizures.  The doctor doubled the dosage.  (Tr. 174).

In July 1999, Alvarez began seeing a new counselor at SFCGC, licensed social worker Troy Fernandez ("Fernandez").  The records indicate that he continued to see Fernandez until February 2000.[13]  (Tr. 149-150, 152-153, 155-157, 159-162, 276-279).  During that time, Fernandez noted that Alvarez continued to drink daily, in spite of his cirrhosis, and that he needed to enroll in an alcohol treatment facility.  (Tr. 149, 162).  He noted also that Alvarez reported he was drinking one beer a day as a means of calming his nerves, but Fernandez stated it appeared Alvarez was actually drinking more than this, as he often smelled of alcohol and is a "chronic alcoholic."  (Tr. 161).

In August 1999, Alvarez told Fernandez that he continued to have seizures, that he had back pain as a result of falling during seizures, and that his problems included the seizure disorder and an inability to work.  Fernandez also noted it was "highly likely" that the reason Alvarez was making the effort to see him regularly was "to help him secure Social Security benefits" (Tr. 159, 160), and he sometimes spent time in therapy sessions helping Alvarez fill out Social Security forms.  (Tr. 155).  Fernandez also noted, however, that in spite of this apparent ulterior motivation, Alvarez "appears

---

[13]There are no notes by Fernandez after February 2000, but he did write a "To Whom It May Concern" letter on October 30, 2000 in which he noted that Alvarez had been a client at SFCGC for many years, but that he was not able to maintain steady attendance at therapy sessions because of a lack of transportation.  He stated his opinion that Alvarez could benefit from therapy and medical care for his alcoholism.  (Tr. 240).

to be trying to head in the direction of health and recovery." (Tr. 157, 159).

In September 1999, Alvarez's M.D. at SFCGC noted that Alvarez was still drinking daily, and the doctor put him in contact with the director of the Recovery for Alcoholics Program ("RAP"). (Tr. 158). Alvarez then told his counselor, Fernandez, that he was trying to get into the RAP program. (Tr. 157). Fernandez felt that Alvarez was clearly experiencing physical and emotional difficulties resulting from chronic alcohol abuse, but that he was making a concerted effort to get treatment and was very invested in participating in therapy. (Tr. 155-156).

On September 29, 1999, a clinical note by Alvarez's M.D. at SFCGC stated that Alvarez had started with the RAP program, but he also reported he'd had two beers the night before, and the doctor wrote that Alvarez appeared tremulous and smelled of alcohol. He also noted an enlarged, tender liver and diagnosed cirrhosis, secondary to alcohol use. (Tr. 154).

There are no records from the RAP program, but Alvarez reported to his doctor and counselor at SFCGC that he signed up for the RAP program and attended the program for awhile. However, in October 1999, he dropped out of the program, complaining that the director of the program called him names and generally treated him badly. (Tr. 152, 153). At this point, on October 12, 1999, his counselor, Fernandez, noted that the next step was to "figure out what to do next in terms of [Alvarez's] alcoholism." (Tr. 152). His M.D. noted two days later, on October 14, that Alvarez left RAP after being "treated badly," and that Alvarez claimed that medications were given to others, the staff was abusive, that he was forced to work and the food was poor. (Tr. 151).

On December 14, 1999, Dr. Robert Hillman conducted a consultative psychiatric assessment of Alvarez in connection with his application for SSI. (Tr. 211-212). He reported that Alvarez said he was applying for SSI because of a seizure problem, which he'd had since childhood. Alvarez

described what happens during his seizures; he get "the shakes," bites his tongue, occasionally loses consciousness and is incontinent.  He told the doctor he'd found out some time ago that alcohol "calmed down" his seizures; however, he also said he didn't think he had a drinking problem "because as long as he has his medication (Dilantin) he does not get seizures."  Alvarez also reported having peptic ulcer disease and cirrhosis.  Alvarez said he didn't feel he had any mental problems, although he admitted to feeling depressed over his physical problems.  (Tr. 210).

Dr. Hillman reported Alvarez's mental status examination as essentially normal.  He noted that Alvarez related in a calm and pleasant manner with no evidence of mannerisms; his speech was normal in rate and volume and smooth flowing without stuttering, and was logical, coherent, concise and relevant.  Alvarez appeared to be neither anxious nor depressed, and there was no evidence of visual or auditory hallucinations.  His cognitive functions were reasonably good, with some mathematical errors when he tried to subtract serial sevens and threes.  But his recent and remote memory were intact, and his retention and recall were unimpaired.  The doctor noted "[h]e has limited insight into his illness and the need for treatment."  (Tr. 211).

Dr. Hillman's diagnosis was "a past history strongly suggestive of alcohol dependence," and personality disorder, not otherwise specified.  He assigned Alvarez a GAF of 50.[14]  He noted that he thought Alvarez was minimizing the degree to which alcoholism is a problem and stated he suspected that many of his seizures were in fact withdrawal seizures from alcohol.  (Tr. 211-212).

Alvarez's physical condition was assessed in a consultative examination (Tr. 216-218), conducted on December 29, 1999 by Dr. Leonore A. Herrera, an M.D. whose primary specialty is

---

[14]A GAF of 50 indicates serious symptoms, or any serious impairment in social or occupational functioning. DSM-IV [*See,* Doc. 9, Ex. 2].

general surgery.  (Tr. 251).   Alvarez told Dr. Herrera that he'd been having seizures since the age

of 18 and didn't know the cause.  He used to take medication for the seizures but now cannot afford

it.  He said he had chronic neck and back pain with muscle tightness, caused by back injury occurring

during seizures.  He also stated he had cirrhosis and upper GI bleeding due to heavy alcohol intake

in the past.  The doctor noted other medical history including gastritis, peptic ulcer disease, "which

may be related to his alcohol intake,"  and closed head injury, "also due to alcohol related trauma."

(Tr. 216).

Dr. Herrera examined Alvarez and found that his neck was supple, but his muscles were

tender with limited range of motion, although this "may have been voluntarily inhibited."  She found

his chest and heart normal.  His abdomen was noted to be soft, tender in the upper epigastrium and

upper quadrants.  The liver was not palpable.  Although Alvarez could lift his arms overhead without

difficulty, he had some limitation in range of motion and some muscle tenderness around the spine.

The neurological examination was normal, except that he was involuntarily tremulous, especially

when stressed.  (Tr. 217-218).

Dr. Herrera's opinion regarding limitations on Alvarez's ability to work was that his back pain

and muscle tightness would limit his lifting ability, and he had further limitations in standing and

walking.  She also noted, "Other parameters limited are those that require the patient to be seizure

free.  During periods of seizure activity, he is certainly not able to do purposeful work.  Since seizures

are happening frequently, he will need medication and ongoing medical management in order to

control them and make him available to the work force."  (Tr. 218).

Her final diagnosis was that Alvarez suffered from alcoholism with liver disease, cirrhosis and

GI bleeding.  She noted he had chronic seizures, most recently one week before, and his seizure

disorder was "possibly alcohol related or based on closed head injury from alcohol related trauma." He also had a diagnosis of anxiety depression.  (Tr. 218).

Psychiatrist Scott Walker M.D. completed the Psychiatric Review Technique form on January 11, 2000.  He reviewed the reports of Drs. Capper, Hillman and Reiniga (Alvarez's primary care physician at SFCGC).  Dr. Walker noted that there was no documentation of Alvarez's seizures in the form of EEG, x-rays or other lab tests, and no witness had confirmed that Alvarez even has seizures.  He concluded that "[p]sychiatrically it is not clear that if this claimant beca[me] abstinent that there would be any mental impairment," and that "[c]ontinuous drinking is material to all alleged problems" in Alvarez's record.  He found that "[n]o severe psychiatric impairment is documented other than alcoholism," but noted that Alvarez's claim may need to be reviewed for physical issues. (Tr. 220).   In sum, Dr. Walker found no evidence that Alvarez had any mental disorder, other than substance addiction disorder.  (Tr. 221-225).

An RFC Assessment, dated January 19, 2000, was filled out by internist David Green M.D., whose primary specialty is pulmonary diseases.  (Tr. 253).  Dr. Green reviewed the medical records and determined that Alvarez had some minor exertional and postural limitations but no manipulative, visual, or communicative limitations.  The only environmental limitation he found was the need to avoid exposure to machinery and heights.  He concluded that the record evidence and consultant's examinations do not suggest a disabling medical condition.  He stated that Alvarez "does not get proper medical care and his problems are not seen as significant as he alleges.  He does not appear to have much credibility."  (Tr. 233-237).

In two reports that are undated, or illegibly dated, but which appear to be from January 2000, SFCGC Social Worker Troy Fernandez reported that Alvarez called him to say he was still having

seizures, but he was not drinking.  (Tr. 279).  Alvarez visited Fernandez a few days later and told him

that he was still trying to maintain his sobriety.  They worked on Alvarez's SSI papers.  (Tr. 278).

In a visit on February 9(?), 2000, Fernandez again came in for help with SSI paperwork.  Fernandez

noted, "It is clear that the client is not particularly interested in seeking treatment" (Id.), and that "It

would appear the only interest Mr. A has at this time is to secure his benefits" (Tr. 277).  He planned

to continue monitoring Alvarez's progress but was also considering closing his case.  (Id.).

On about February 12, 2000, Alvarez came in to see Fernandez again, stating he was still

somewhat depressed and was still drinking, although it was "very little as he cannot afford it."  At this

session, they again spent time filling out SSI paperwork.  Fernandez noted , "It would appear that the

client is simply and sadly unable to stop his drinking, which is at the core of his physical problems."

(Tr. 276).  Fernandez again noted that he was considering closing the case, as Alvarez was unable

to attend therapy on a regular basis.  (Id.).  The notes from Fernandez end at this point.

There is no indication that Alvarez sought treatment from SFCGC again until one year later,

on February 14, 2001.  An unsigned Intake and Substance Abuse Evaluation Form of that date (Tr.

283-286) noted that Alvarez was a former client of SFCGC who was now returning for treatment.

His complaints were depression, anxiety, "ideas of reference," and paranoia.  (Tr. 285).  He was

noted to have a chronic alcohol abuse and dependence problem for the past 25 years, along with

significant liver and stomach damage.  It was also noted that Alvarez's case had been closed before

because he had been noncompliant with treatment.  (Id.).

At this intake interview, Alvarez stated that he had been using alcohol for the past 33 years,

but he denied having used alcohol or other substances during the immediately preceding 30 days.  He

said he did not see any need for alcohol or drug treatment.  (Tr. 284).  He said he had been treated

16

for psychological problems 25 times as an outpatient, and that his psychological problems included serious depression, serious anxiety or tension, and trouble understanding, concentrating or remembering.  He was not suicidal and was not taking any medication for his psychological or emotional problems.  (Tr. 285).  The Diagnostic Impression was noted as Alcohol-Related Disorder with mixed anxiety, depressed mood and psychotic features, depressive disorder, and severe problems in all areas of psychological functioning.  He was also noted to have cirrhosis of the liver, seizure disorder, body pain related to seizure induced falls, and chronic and lifelong alcohol abuse.  (Tr. 286).  The recommended treatment was psychological evaluation, medical management, and case management / support for return to an alcohol treatment program.  (Id.).

Following this intake, Alvarez was apparently assigned to Barbara A. May, Ph.D., R.N., C.N.S., who performed a psychiatric assessment on February 22, 2001.  She noted his complaints of depression, anxiety, and insomnia.  Alvarez stated he had been sober for 7 months.  His medical problems included cirrhosis of the liver, seizure disorder, and bleeding ulcer.  His mental status exam showed an depressed and anxious mood/affect.  He said he had hallucinations consisting of voice from the TV saying threatening things.  He had poor memory and concentration, problems with organization and focus, and inability to follow through with projects.  (Tr. 282).  Dr. May's diagnosis was alcohol related disorder, alcohol dependence in remission, and major depressive disorder with psychotic features. She gave Alvarez a GAF score of 45.  She prescribed Paxil, an antidepressant. (Id.).

Alvarez's medical records from SFCGC continue from February 2001 until September 17, 2001.  (Tr. 259-268, 271-273).  On March 19, he was noted to have continued paranoid ideation, racing thoughts, anxiety, and depression.  (Tr. 271).  During April, May and June of 2001, he showed

17

some improvement on Paxil, although he remained somewhat depressed.  He reported on June 27, 2001 that he was attending AA regularly.  (Tr. 260).  The record includes certificates showing that Alvarez attended AA meetings in August, September and October 2001.  (Tr. 136-140).

The next mention of Alvarez's care at SFCGC is a note that he returned for treatment in March 2002 with symptoms of anxiety and depression, and that he would now be receiving ongoing care at that facility.  It was only after Alvarez was evaluated by Dr. Gary Borrell, Staff Psychiatrist at SFCGC, that the diagnosis of PTSD, resulting from the beating he suffered in 1994, was recognized.  (Tr. 298).  As noted above, Plaintiff's counsel submitted two reports from Alvarez's medical care providers at SFCGC after the date of the ALJ's decision but before the Appeals Council considered Alvarez's request for review.  These two reports are from Dr. Borrell, the Staff Psychiatrist, dated June 6, 2002, and from Mary Beth Huberman, M.A., who wrote a Mental Health and Substance Abuse Evaluation of Alvarez on August 27, 2002.

In his report (Tr. 292-293), Dr. Borrell stated he had done eight sessions with Alvarez in the six months between March and August, 2002, during which time Alvarez "has become consistently sober."  His diagnosis was that Alvarez was suffering from PTSD, dementia caused by brain trauma, alcohol dependence in early full remission, head injury, seizures due to brain injury, chronic pain, ulcers, and possible liver damage.  He gave Alvarez a GAF of 40.[15]  Dr. Borrell also noted that Alvarez was at that time receiving individual therapy, case management, psychiatric and medical care at SFCGC.  He noted that Alvarez had been consistently sober for the preceding four months and that he had a high motivation for sobriety.  Alvarez was attending AA meetings weekly.  (Tr. 292).

---

[15]DSM-IV provides that a GAF of 40 indicates either some impairment in reality testing or communication, or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood. [Doc. 9, Ex. 2].

18

In Dr. Borrell's opinion:

> The single most important life event affecting the current functioning of this client was the severe beating he received in 1994.
>
> As a result of the beating, he suffered a traumatic brain injury. He was twice resuscitated after cardiac arrest. He has had grand-mal seizures since that time, which are only partially controlled with dilantin. His neurological problems may be due to the direct effects of the brain injury, or may also be due to effects of brain anoxia which occurred before he was resuscitated.
>
> In terms of his psychological functioning, he began to display classi[c] symptoms of Post-traumatic Stress Disorder since the beating: nightmares, flashbacks, hypervigilance, increased startle response, emotional numbing, difficulty sleeping, difficulty concentrating, restricted range of affect, feelings of estrangement from others, and intense psychological and physiological reactivity to cues that remind him of the beating.

(Tr. 292-.293).

Dr. Borrell's opinion is that Alvarez suffers from the following marked to severe impairments: inability to concentrate, memory deficits, inability to complete tasks, and inability to understand and carry out instructions. He does not think that Alvarez is capable of any gainful activity, and says further that although Alvarez's condition can be stabilized with ongoing psychiatric and medical care, he suffers from irreversible brain damage and no marked improvement can be expected, as "organic brain damage makes recovery from psychological symptoms much more difficult." (Tr. 293).

Mary Beth Huberman stated in her August 27, 2002 evaluation that Alvarez was receiving medical and psychiatric care, individual therapy, and case management at SFCGC for depression and anxiety, chronic pain, and seizures. He was taking Paxil for his psychiatric problems, as prescribed by Dr. Borrell; Dilantin and Darvocet for neurological problems and chronic pain, as prescribed by his primary care physician at SFCGC, Dr. Reininga; and Prontonix for acid reflux and ulcers, as prescribed by his private physician, Dr. Dooley. (Tr. 294).

19

She noted further that Alvarez has been having mild seizures since he was 17 years old, but the seizures became much worse after the traumatic brain injury he suffered in 1994.  Alvarez is now taking Dilantin for this problem, and it partially controls his grand mal seizures.  She said that Alvarez also suffers from chronic pain in his back and knees as a result of the 1994 beating, and suffers from organic brain damage, also due to the beating, which has resulted in signs of dementia.  (Tr. 295). In summary, the 1994 beating resulted in symptoms of PTSD including hypervigilance, increased startle response, nightmares, flashbacks, difficulty sleeping, difficulty concentrating, and social withdrawal.  (Tr. 297).  The Paxil is he taking helps to moderate his PTSD symptoms.  (Tr. 297, 298).

Huberman also noted that Alvarez has a long history of alcohol use but that he had been completely sober for the preceding four months.  He was attending AA meetings weekly, and his motivation for sobriety was very strong.  She wrote that Alvarez started drinking at age 18.  His father, one brother, and one sister were all alcoholics and are now dead from alcohol related problems.  She stated further, "He reports that drinking was just a normal thing for him to do – it was part of what his family did, and later, a regular part of what his friends did.  He no longer associates with people who drink.  The couple he lives with do not drink or use substances."  Alvarez told her that he now lives in Chupadero, a rural New Mexico town, with a couple who is very supportive of him.  (Tr. 296-297).

**Discussion**

Alvarez argues that the medical evidence submitted after the ALJ rendered his decision establishes that he meets the requirements for disability under Listing 12.02 (Organic Mental Disorders), and Listing 12.04 (Affective Disorders).  He further argues that the new evidence would

20

change the ALJ's analysis of whether alcohol was a contributing factor material to the determination of disability, in that the evidence demonstrates that both the seizure disorder and the depression were caused by the brain injury he received in 1994, rather than by alcoholism.

    A.  <u>Brain Injury</u>.

The Court finds that the new opinion by Dr. Borrell does indeed change the mix of evidence on the issue of traumatic brain injury.  The record needs further development with regard to the allegations of organic brain injury in terms of whether Alvarez's condition meets the requirements of Listing 12.02, and also in terms of the alcohol issue.  The Court will therefore remand for further proceedings on this issue.

Alvarez testified at the administrative hearing that, in 1994, as he was walking home from a casino after "winning pretty good," he was jumped by some guys who beat him up, took his money, and left him for dead in the street.  (Tr. 71).  He sustained a head injury from the beating and spent 28 days in the hospital.  He already had a seizure condition prior to this beating, but the seizures became worse after the incident.  (<u>Id</u>.).  Alvarez further testified that, since that incident, he has had flashbacks of what occurred and has been very nervous.  He doesn't go out much, and is in fact afraid to do much of anything because he's worried that he might get jumped again.  He can't sleep at night and thinks about death a lot.  He has been depressed and suffers from anxiety, and this affects his memory and his ability to concentrate.  (Tr. 60, 66, 71).  He has been even more nervous since he quit drinking alcohol.  (Tr. 67).

Dr. Borrell is Alvarez's treating psychiatrist.  He reported that Alvarez suffered a traumatic brain injury as a result of the 1994 beating, and that this incident is the "single most important life event affecting the current functioning  of this client."  (Tr. 292).  He says that Alvarez was twice

resuscitated after cardiac arrest following the beating, and that he has had grand-mal seizures since that time, which are only partially controlled with medication. (Id.). The report by Mary Beth Huberman also states that the Dilantin only partially controls the Alvarez's grand mal seizures. (Tr. 295).

Alvarez confirmed in his hearing testimony that the medication helped with his seizures but did not stop them completely. He has the seizures with the same frequency when he is taking medication, although they are not as strong. (Tr. 63-64). He also testified that, when he stopped drinking, his seizures did not get any better. (Tr. 63).

Alvarez said that the seizures usually last from one to two minutes, and that he typically loses consciousness. He often falls during the seizures and has sustained further head injuries from these falls. When he comes to, he is shaky and trembling, and it takes two or three days until he feels normal again. (Tr. 64-65). At the hearing, Alvarez's roommate testified that she has witnessed Alvarez's seizures, and she described what she saw. (Tr. 74-75).

Alvarez has not supplied any medical records from the 1994 hospitalization, nor any lab tests to support his claim of traumatic brain injury. These are not required, but they would be helpful on remand, so that the Commissioner can better evaluate whether Alvarez does in fact have an Organic Mental Disorder, defined in Listing 12.02 as:

> Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

20 C.F.R. Part 404, Subpart P, App. 1, § 12.02 (2003).

In spite of the lack of these medical records or laboratory findings, however, the record does

indicate that Alvarez told various medical care providers about the 1994 attack, and that he was diagnosed previously with PTSD. (Tr. 150, 203, 208). It appears to be the case, as Plaintiff argues, that none of his doctors or other care providers picked up on this information or did further tests to determine whether the 1994 beating may have caused organic brain damage and may be responsible for the worsening of his seizure condition.

When Dr. Herrera performed the consultative physical examination on Alvarez, she noted in her final diagnosis that he has chronic seizures and that his seizure disorder is "possibly alcohol related or based on closed head injury from alcohol related trauma." (Tr. 218). There is nothing on the record to support her statement that Alvarez's closed head injury was due to "alcohol related trauma." Alvarez's description of the 1994 incident indicates only that Alvarez was the victim of a crime. There is nothing to show that Alvarez had been drinking at the time of this criminal act and, even if he had been, there is no indication that alcohol abuse "caused" the injury, as might be the case if, for example, he had been driving while intoxicated.

Plaintiff argues that he qualifies as disabled under Listing 12.02, in that he satisfies the requirements of both sections (A) and (B) of that listing. Under subsection (A), he has to demonstrate a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of 7 listed conditions. Alvarez argues that he has demonstrated number 5, "Disturbance in mood," given Dr. Borrell's statement that Alvarez suffers from hypervigilance, emotional numbing and restricted range of affect.

Under subsection (B), he must show that the mood disturbance has resulted in at least two of the following: marked restriction in activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, or repeated extended episodes

of decompensation.  Alvarez argues that he meets the first three requirements, as evidenced by Dr. Borrell's statements that he suffers from nightmares, flashbacks, difficulty concentrating, an increased startle response, and feelings of estrangement from others.

There is other evidence on the record that Alvarez suffers from a disturbance in mood, and that this results in restrictions in his activities of daily living and social functioning, as well as difficulties in maintaining concentration, persistence or pace.  He has been described by his doctors as having "quite significant psychiatric problems" (Tr. 243) and has been diagnosed with PTSD (Tr. 150, 203, 208), as well as anxiety and depression.  (Tr. 150, 214, 218, 271, 282, 286).  Poor memory and concentration are also noted on the record.  (Tr. 66, 282, 285), and Alvarez states that he  does very little socially and has lost interest in his hobbies such as playing the guitar.  (Tr. 60, 61, 68-69, 120-123, 134).

With regard to whether alcohol contributes to his condition, Dr. Borrell states that Alvarez's neurological problems are either direct effects of the brain injury, or else due to effects of brain anoxia which occurred before he was resuscitated.  He does not attribute the seizure disorder to alcohol consumption.  He states that Alvarez's brain damage is "life-long and irreversible," and reports that although Alvarez has been consistently sober for the past six months, he nevertheless continues to suffers from the seizure symptoms.  As noted above, Alvarez confirmed this at the administrative hearing, when he testified that the seizures did not get any better when he quit drinking.   The new medical evidence, had it been before the ALJ, might have led to a different ruling on the alcohol issue.  The opinion of a claimant's treating physician must be given substantial weight unless there is good cause to do otherwise.  Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987).  There is no indication that the Appeals Council properly considered the new evidence in this regard.

B.  Depression

In addition to organic brain injury, Plaintiff argues that he qualifies as disabled at step three of the analysis because he meets the requirements for Listing 12.04, affective disorders.  As with the brain injury disability, Dr. Borrell's report changes the thrust of the evidence with regard to Alvarez's affective disorder.

Plaintiff argues that he qualifies as disabled under Listing 12.04, in that he satisfies the requirements of both sections (A)(1) and (B) of that listing.  Under subsection (A)(1), he has to show medical documentation of a depressive syndrome, which is characterized by at least 4 symptoms out of a list of 9.  Alvarez argues that he satisfies the following four elements:  anhedonia or pervasive lack of interest in almost all activities; sleep disturbance; psychomotor agitation; and difficulty concentrating.

Dr. Borrell's statement that Alvarez suffers from emotional numbing, restricted range of affect, and feelings of estrangement from others, he argues, indicates anhedonia.  In addition, as noted above, Alvarez testified that he doesn't go out much, has limited social contacts, and used to play the guitar but has lost interest in it.  The second symptom, sleep disturbance, is amply described at many places in the record, (Tr. 66, 112, 124, 150, 174, 210, 213, 259, 279, 282), including in Dr. Borrell's report.

The psychomotor agitation element is satisfied by Dr. Borrell's statement that Alvarez's PTSD symptoms include hypervigilance and an overactive startle response.  And, with regard to the element of difficulty in concentrating, Dr. Borrell states that Alvarez suffers from inability to concentrate, memory deficits, inability to complete tasks, and inability to understand and carry out instructions.  Dr. May, who examined Alvarez in 2001, also noted poor memory and concentration,

problems with organization and focus, and inability to follow through with projects.  (Tr. 282).  Dr. Borrell further states that Alvarez is not capable of gainful employment and, although his condition can be stabilized, no marked improvement can be expected.

Under subsection (B) of Listing 12.04, Alvarez must show that the mood disturbance has resulted in at least two of the following:  marked restriction in the activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, and repeated extended episodes of decompensation.  Alvarez argues that he meets the first three requirements, as evidenced by Dr. Borrell's statements that he suffers from nightmares, flashbacks, an increased startle response and feelings of estrangement from others, and has difficulty concentrating.  And, as noted above, there is other evidence on the record that Alvarez is restricted in his activities of daily living and in maintaining social functioning, and that he shows marked difficulty in maintaining concentration.

In addition to Dr. Borrell's report, the record is replete with evidence that Alvarez suffers from affective disorders including depression, anxiety and PTSD, and has for many years.  The Court acknowledges that there are statements in the medical records that Alvarez's affective problems are minimal, or are caused by alcohol.  However, Dr. Borrell, Alvarez's current treating psychiatrist, attributes these conditions to the beating he received in 1994, noting that Alvarez displays classic symptoms of port-traumatic stress disorder including nightmares, flashbacks, hypervigilance, increased startle response, emotional numbing, difficulty sleeping, difficulty concentrating, restricted range of affect, feelings of estrangement from others, and intense psychological and physiological reactivity to cues that remind him of the attack.  (Tr. 292-293).  The ALJ was not able to consider this evidence, and the Court finds that the Appeals Council did not adequately take this evidence into

account when it affirmed the ALJ's ruling.

As noted above, Dr. Borrell states that Alvarez's brain damage is "life-long and irreversible," and that "organic brain damage makes recovery from psychological symptoms much more difficult." (Tr. 293).  He notes in his report that Alvarez had been consistently sober for the past six months, but that he still displays the classic symptoms of PTSD which have been present since the 1994 beating.  When the ALJ asked at the hearing whether Alvarez's anxiety and depression symptoms improved once he stopped drinking, Alvarez answered that he's actually more nervous now, since he quit drinking.  This would tend to show that alcohol is not a contributing factor in Alvarez's affective disability.  The Commissioner must consider Dr. Borrell's evidence, along with other evidence of record, in making the alcohol determination.

## <u>Conclusion</u>

On remand, the Commissioner is directed to consider again the evidence submitted by Alvarez after the administrative hearing, and Plaintiff should be allowed an opportunity to further develop the record with regard to his allegation of a traumatic brain injury occurring in 1994.  Any further medical records or other information relating to this injury should be produced by Plaintiff and considered by the Commissioner.

In light of this new evidence, the Commissioner is specifically directed to further develop the record and to consider whether Alvarez meets Listing 12.02 (Organic Mental Disorders) due to his traumatic brain injury, or Listing 12.04 (Affective Disorders) as evidenced by his depression and PTSD.  The Commissioner is further directed to reconsider the determination that, apart from alcohol abuse, Alvarez is capable of performing either his past relevant work or other work that exists in the national economy.

## **Order**

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse or Remand [Doc. 9] is granted, and the case is remanded to the Commissioner for proceedings consistent with this Memorandum Opinion and Order.

Lorenzo F. Garcia
Chief United States Magistrate Judge